Hedwiche JEANTY, Brunot Colas, Junior Prospere, and Laurence St. Pierre, on behalf of themselves and all others similarly situated, Petitioners,

v.

John M. BULGER, Acting Director for District 6, Immigration and Naturalization Service; James Ziglar, Commissioner, Immigration and Naturalization Service; John Ashcroft, Attorney General of the United States; Immigration and Naturalization Service; and United States Department of Justice, Respondents.

No. 02–20822–CIV.

United States District Court, S.D. Florida.

May 17, 2002.

Jonell Newman, Florida Justice Institute, Inc., Miami, FL, Rebecca A. Sharpless, Florida Immigration Advocacy Center, Miami, FL, Ira J. Kurzban, Kurzban, Kurzban, Winger & Tetzeli, Miami, FL, Robert L. Parks, Haggard & Parks, P.A.,

Coral Gables, FL, Charles F. Elsesser, Jr., Miami, FL, for Petitioners.

Dexter Lee, Asst. U.S. Attorney, United States Attorney's Office, Miami, FL, Robert D. McCallum, Jr., M. Jocelyn Lopez Wright, Office of Immigration Litigation, Civ. Div., U.S. Department of Justice, Washington, DC, Mary Jane Candaux, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, DC, for Respondents.

### ORDER DENYING PETITIONERS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION OR CLASS WRIT OF HABEAS CORPUS AND FOR IMMEDIATE HEARING, DENYING MOTION TO CERTIFY CLASS, AND DISMISSING CLASS ACTION PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

LENARD, District Judge.

Petitioners journeyed the high seas to flee Haiti, with hopes of obtaining political asylum and discovering freedom in America. Rather than liberation, they find themselves confined in Miami detention facilities while their asylum applications remain pending. Understandably, Petitioners express confusion about their present circumstances, and they implore the Court to grant them freedom.

Yet, "[n]o judge writes on a wholly clean slate".[1] A district court must apply the body of law found in statutes enacted by Congress, regulations and policies promulgated by the Executive, and the precedents handed down by the Supreme Court and appellate courts.

> Courts are the mere instruments of the law, and can will nothing.... Judicial power is never exercised for the purpose of giving effect to the will of the Judge; always for the purpose of giving effect to the will of the Legislature; or, in other words, to the will of the law.

*Osborn v. Bank of United States,* 22 U.S. (9 Wheat.) 738, 866, 6 L.Ed. 204 (1824) (Marshall, C.J.).

Particularly in the area of immigration, which strikes at the heart of a nation's sovereignty, courts generally must defer to the laws established by Congress and administered by the Executive branch of government. Given the narrow scope of judicial review permitted in this area, Petitioners' cry for freedom needs to be directed to those representatives of the political branches responsible for enacting immigration laws and policies. Mindful of the limits on judicial power, the Court proceeds to wade through the complicated issues presented by the instant case.

### I. Factual and Procedural Background

On December 3, 2001, U.S. Coast Guard officials sighted a rickety and overloaded sailboat, the *Simapvivetzi,* off the coast of South Florida, near Biscayne National Park. The Coast Guard rescued approximately 167 Haitian nationals from the boat. Eighteen others swam to shore, and two more individuals reportedly drowned while attempting to swim to shore.[2] The Coast Guard turned over the 167 rescued Haitians to the custody of the Immigration and Naturalization Service ("INS"). The

---

**1.** Justice Felix Frankfurter, *The Commerce Clause* 12 (1937).

**2.** The eighteen Haitian migrants who swam to shore were considered by the INS to be "present without inspection," rather than "arriving aliens," as were the aliens brought to shore by the Coast Guard. (Gov't Opp. to Pets.' Mot. for TRO/PI/Writ at 5 n.3.) As such, the eighteen who swam to shore were released from detention and are not parties to this action.

INS placed male detainees at Krome Detention Center, female detainees at Turner Guilford Knight Detention Center, and families at a local motel.

As none of the aliens arrived with proper entry documentation, they were legally "inadmissible" under the Immigration and Naturalization Act ("INA") and, therefore, were placed into expedited removal procedures. Each of the adults was referred for an interview with an INS Asylum Officer to determine whether he or she had a "credible fear" of persecution if returned to Haiti. Each individual that passed the credible fear interview received a Form I-862 "Notice to Appear" for full non-expedited removal proceedings, including the opportunity to apply for asylum before an immigration judge.[3] At this point in the process, the INS typically releases aliens on parole pending the final adjudication of their asylum petitions.

Beginning in mid-December, 2001, the INS reversed its general presumption of release for undocumented Haitians arriving in South Florida. According to INS Acting Deputy Commissioner Peter Michael Becraft, officials from several Executive agencies had observed a sharp increase in dangerous maritime departures from Haiti and grew concerned over the potential for more loss of life and the threat of mass migration. (Becraft Decl. ¶ 8.) Based on consultations with other Executive officials, Becraft instructed the Miami INS office that no undocumented Haitian should be released without the approval of INS Headquarters. (*Id.*) Miami officials learned of the policy adjustment on or about December 14, 2001. (Lee Decl. ¶ 11.) Miami officials continued to review the cases of arriving Haitians and recommended to Headquarters the release of approximately fifteen Haitians, including pregnant women and unaccompanied minors, who arrived after December 3, 2001 (*Id.* ¶ 12.) On February 2, 2002, Miami officials received permission to release pregnant women and unaccompanied minors without obtaining Headquarters' approval. (2/15/02 e-mail of David J. Venturalla.) On March 8, 2002, the Miami office was authorized to release, without Headquarters approval, Haitians granted asylum where the INS decided not to appeal. (Becraft Suppl. Decl. ¶ 7.) On April 5, 2002, Executive Associate Commissioner for the Office of Field Operations Johnny N. Williams and Regional Director J. Scott Blackman authorized Miami officials to release Haitians who arrived by "regular means at a designated port of entry" (e.g. by airplane), pursuant to enhanced procedures for assuring the alien's likelihood of appearing at immigration proceedings. (*Id.* ¶ 9.)

Petitioners are four Haitian nationals who were rescued from the *Simapvivetzi* on December 3, 2001.[4] All four have passed their credible fear interviews yet

---

**3.** The Government indicates that 165 of the 167 Haitian nationals rescued from the *Simapvivetzi* passed their "credible fear" interviews. (Gov't Opp. to Pets.' Mot. for TRO/PI/Writ at 5 n.3.) The other two were placed into expedited removal proceedings and are not parties to the instant action.

**4.** Originally, six named Plaintiffs/Petitioners filed this action. Subsequently, two of the original six were released from custody. The original lead Plaintiff/Petitioner, Ernest Moise, arrived aboard the *Simapvivetzi*. He and his family were granted asylum and released from detention on March 19, 2002. The Government filed a Motion to Dismiss Moise (D.E.16) on March 20, 2002. Petitioners conceded that his claims are moot. (D.E.29.) The Court granted the Motion to Dismiss Moise on May 10, 2002. (D.E.57.) The other original named Petitioner, Peterson Belizaire, arrived by plane at Miami International Airport on December 17, 2001. He applied for parole on February 27, 2002, and his application was denied on April 4, 2002. After the INS changed its policy with regard to Haitians arriving by plane, Belizaire completed a new parole request form. Upon his

remain in detention. Petitioners Jeanty, Colas, and Prospere applied for and were denied parole in late January, 2002. Petitioner St. Pierre submitted a letter requesting parole on February 7, 2002 On April 9, 2002, she submitted a parole request form and identified a sponsor. As of April 12, 2002, the sponsor had not submitted an affidavit of support, and Petitioner St. Pierre's parole request remained pending. (Lee Suppl. Decl. ¶ 2.)

On March 15, 2002, Plaintiffs/Petitioners filed a Class Action Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief (D.E.1), an Emergency Motion for Temporary Restraining Order and/or for Preliminary Injunction or Class Writ of Habeas Corpus, and for an Immediate Emergency Hearing (D.E.2), and a Motion to Certify Class (D.E.5). The Government filed an Opposition to Petitioners' Motion to Certify Class (D.E.13) and an Opposition to Plaintiffs' Emergency Motion for Temporary Restraining Order and/or for Preliminary Injunction or Class Writ of Habeas Corpus (D.E.14) on March 18, 2002. Petitioners filed Replies on March 21, 2002. (D.E.20, 21.)

Upon consideration of the briefs, the Court requested further information from both sides on April 5, 2002 (D.E.30.) Pursuant to the April 5th Order, Petitioners submitted copies of the named Petitioners' parole requests (D.E.34); the Government submitted copies of Petitioners' immigration files (D.E.37); and Becraft and Lee submitted supplemental declarations (D.E.38). The Government also submitted a copy of the INS's "Detention Use Policy," copies of electronic communications between INS officials regarding the policies toward Haitians arriving in South Florida, and copies of two memoranda, dated April 5, 2002, entitled "Procedures for Paroling Haitians Arriving by Regular Means at a Designated Port of Entry in South Florida." (D.E.39.)

Once the issues were fully briefed, the parties continued to file additional pleadings. Petitioners submitted a Notice of Filing of Supplemental Exhibits, including an advisory opinion issued by the United Nations High Commissioner for Refugees on April 15, 2002, and statements by social workers and legal personnel regarding the conditions at the detention facilities. (D.E.40.) The Government moved to strike the supplemental argument as untimely, or, alternatively, to respond. (D.E.46.) The Government also requested leave to file supplemental exhibits, including statements by Miami INS officials with respect to policies at the detention facilities. (D.E.47.) Petitioners filed an Opposition to the Motion to Strike, maintaining that the international law issues raised in the advisory opinion are relevant, although conceding that they have not alleged international law claims.[5] (D.E.58)

sponsor's completion of an affidavit of support, Belizaire was released on parole on April 18, 2002. The Government filed a Motion to Dismiss Belizaire (D.E.45) on April 26, 2002. Petitioners conceded that his claims are moot. (D.E.53.) The Court granted the Motion to Dismiss Belizaire on May 10, 2002. (D.E.57.)

**5.** The opinion, issued by the UNHCR at the request of Petitioners' counsel, concludes that under international refugee law (including the 1967 Protocol relating to the Status of Refugees, to which the United States is a party),

detention should not be used as a means of deterring asylum seekers from seeking protection in a given country, and that detention is arbitrary, and therefore illegal, when asylum seekers of a particular national origin are subject to more restrictive criteria for release from detention than those of other nationalities. (UNHCR Advisory Opinion at 7.) Petitioners state that the advisory opinion is "relevant to the present case" without addressing the issue of whether it constitutes binding authority in this Court. (Pets.' Not. of Filing Supp'l Exs. at 1.) Appellate courts, including the Eleventh Circuit, have held that the 1967

On May 7, 2002, Petitioners filed an Emergency Motion for Leave to Take Depositions of Respondents and to Otherwise Begin Discovery and also to Shorten Time for Response to Petitioners' First Request to Produce. (D.E.50.) On May 8, 2002, Petitioners filed a Motion to Compel, seeking to compel Respondents to produce the redacted portions of the documents submitted in response to the Court's April 5, 2002 Order. (D.E.54.)

On May 9, 2002, the Lawyers' Committee for Human Rights ("LCHR") filed an Amicus Curiae Brief (D.E.55).[6]

On May 14, 2002, the Government filed a Motion to Dismiss in Part and for Summary Judgment in Part, seeking dismissal of the Class Action Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief, or, alternatively, dismissal of claims 2 and 3 for lack of jurisdiction, and summary judgment on all other claims.[7] (D.E.60.)

Upon consideration of the entire record in this matter, the Court finds that the issues were fully briefed in the Petitioners' Emergency Motion for Temporary Restraining Order and/or for Preliminary Injunction or Class Writ of Habeas Corpus, and for an Immediate Emergency Hearing (D.E.2), Motion to Certify Class (D.E.5), Government's Responses (D.E.13, 14), Petitioners' Replies (D.E.20, 21), and the parties' submissions in response to the Court's April 5th Order Directing to Submit Additional Documentation (D.E.34, 37, 38, 39.) Accordingly, the Court finds as follows.

## II. Parties' Arguments

Petitioners seek a writ of habeas corpus on behalf of themselves and a class of:

All detained Haitian aliens in the Southern District of Florida who arrived on or after December 3, 2001, who are applying for admission into the United States, have passed their "credible fear" interviews with the Asylum Office of the INS, and are in detention pending re-

---

Protocol provides no enforceable rights in U.S. courts because it is not a self-executing treaty. *See Haitian Refugee Ctr., Inc. v. Baker,* 949 F.2d 1109, 1110 (11th Cir.1991); *Bertrand v. Sava,* 684 F.2d 204, 218 (2d Cir. 1982). As Petitioners concede that they have not alleged any cause of action under international law, the Court need not further address the conclusions of the advisory opinion.

6. The amicus brief argues that Petitioners' detention violates international law, including the 1967 Protocol and the International Covenant on Civil and Political Rights ("ICCPR"), and alleges that continued detention will have an adverse impact on Petitioners' mental and physical well-being and their ability to present their asylum claims. The brief does not address whether the treaties are enforceable in U.S. courts. The law makes clear that neither the Protocol nor the ICCPR is a self-executing treaty, and, thus, neither provides enforceable rights in U.S. courts. *See supra* note 5; *United States v. Duarte-Acero,* 208 F.3d 1282,

1284 n. 8 (11th Cir.2000) (ICCPR not self-executing); *Buell v. Mitchell,* 274 F.3d 337, 372 (6th Cir.2001) (holding that ICCPR is not enforceable in U.S. courts). Moreover, the Complaint states no cause of action under international law, and the brief alleges no specific facts directed toward the current detention of Petitioners or any other Haitians in Miami. Therefore, the Court need not further address the amicus curiae brief.

7. The Government previously filed an Opposition to Petitioners' Emergency Motion for Temporary Restraining Order and/or for Preliminary Injunction or Class Writ of Habeas Corpus, responding in full to the Emergency Motion. (D.E.14.) Petitioners seek the same relief in the Complaint (D.E.1) and the Emergency Motion (D.E.2). Therefore, the Court finds it unnecessary to consider the Government's Motion to Dismiss and for Summary Judgment, and rules upon the basis of the Emergency Motion and related pleadings.

moval proceedings, for whom a final order of removal has not been entered. (Pets.' Mot. to Certify Class.)

Petitioners argue that the Government has violated their rights pursuant to: (1) the parole statute and regulations, in that parole decisions were not made on a case-by-case basis; (2) the due process clause of the Fifth Amendment, as Petitioners have a right to be free from unlawful detention; (3) the equal protection component of the Fifth Amendment, because the Government has discriminated against them on the basis of race and/or national origin; (4) section 555(e) of the Administrative Procedures Act ("APA"), by not providing an accurate statement for the grounds of denial of parole requests; (5) APA § 553, in that the Government's new policy is a substantive rule that must be adopted through notice-and-comment rulemaking procedures; and (6) APA § 701, in that the Government has unlawfully withheld agency action to which Petitioners are entitled and has not acted in accordance with applicable statutes, regulations, and constitutional provisions.

Petitioners request this Court to issue a temporary restraining order, injunctive relief, or, in the alternative, a class writ of habeas corpus, to compel the Government to: (a) immediately release Petitioners and class members; (b) cease using race and/or nationality as a factor in adjudicating requests filed by Haitian asylum seekers who have passed their credible fear interviews or who are otherwise eligible to be considered for release; (c) evaluate all pending and future requests on a case-by-case basis; (d) reevaluate all denied requests for release filed by Haitian asylum seekers since December 3, 2001, in accordance with the statute, the regulations, and the Constitution; (e) provide accurate notice of the reasons for the denial of the release request; and (f) complete the above within ten days.

The Government opposes class action status on grounds that INA § 242(f)(1) prohibits the Court from granting class-wide relief or, alternatively, due to the fact-sensitive nature of Petitioner's parole applications. Further, the Government argues that the Court lacks jurisdiction, under INA § 242(a)(2)(B)(ii), over Petitioners challenge to the Attorney General's discretionary decision to deny parole. With respect to habeas and injunctive relief, the Government contends that Petitioners have not shown a substantial likelihood of success on the merits, in that: (1) the Fifth Amendment provides Petitioners no relief; (2) the statute presumes the denial of parole, and the Government continues to make case-by-case decisions regarding Petitioners' parole requests; (3) the APA does not apply; (4) the Government has provided a "facially legitimate and bona fide" reason for denying Petitioners parole applications; and (5) Petitioners have not shown that they will suffer irreparable harm in the absence of an injunction, or that the balance of hardships tips in their favor.

With its Response, the Government submitted declarations by Peter Michael Becraft, Acting Deputy Commissioner of the INS, and Wesley Lee, Officer in Charge of INS Krome Service Processing Center in Miami, Florida Becraft stated that after the arrival of 167 Haitians by boat on December 3, 2001, the Government feared a mass migration and sought to deter more Haitians from making the dangerous voyage. (Becraft Decl. ¶ 8.) Becraft asserted that after consulting with various INS officials, he directed the INS Office of Field Operations to adjust its parole criteria with respect to inadmissible Haitians arriving in South Florida, and he instructed that no such Haitians should be paroled without the approval of INS Headquarters. (*Id.*)

In their Reply, Petitioners argue that Becraft lacks sufficient authority to establish a policy that discriminates against Haitians. According to Petitioners, "Only Congress, the President, or possibly the Attorney General has such authority." (Pets. Reply at 2.) They contend, and submit statistics purported to demonstrate, that there is no current Haitian migration crisis. The crux of Petitioners' argument is that the Supreme Court's decision in *Jean v. Nelson*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985), requires the INS to make parole determinations in a non-discriminatory manner without treating Haitians different than other nationalities.

## III. Analysis

Initially, the Court must determine whether it has jurisdiction in view of the limits on judicial review of immigration matters imposed by Congress in 996. The Court concludes that the statute precludes full-scale judicial review of Petitioner's parole applications, but habeas jurisdiction exists to determine the legality of Petitioners' detention.

Limited to habeas jurisdiction, the Court then examines the scope of legal protection available to Petitioners. The law makes clear that Petitioners, as arriving aliens, have no constitutional rights with respect to their immigration applications but, rather, only the rights granted by Congress and the Executive by statute or administrative regulation. By statute. Congress has delegated the authority over parole determinations to the Attorney General, who has further delegated the power to certain high-level INS officials, including the Deputy Commissioner. Third, the Court finds that the Supreme Court's holding in *Jean v. Nelson* does not preclude the Government from adopting a parole policy that differentiates between nationalities. Fourth, the Court must determine whether Acting Deputy Commissioner Be-craft has the authority to adjust parole policy. The Court concludes that the Attorney General has conferred all of his parole-related authority upon the Deputy Commissioner, and the Court thus analyzes the policy as if the Attorney General himself had promulgated it.

The case law establishes that the Court's scope of review is limited to determining whether the Government has advanced a "facially legitimate and bona fide reason" for its parole policies and decisions. Applying this extremely deferential standard, the Court next finds that saving lives, deterring mass migration, and ensuring the presence of inadmissible aliens at their immigration hearings are facially legitimate and bona fide reasons supporting the policy of granting parole to Haitians only in cases of unique hardship. Since Petitioners have not alleged that Miami officials have misapplied the policy in any individual case, the Court concludes that Petitioners' detention is legal.

Finally, the Court examines Petitioners' APA claims. First, the Court finds that it lacks jurisdiction to review Petitioners' individual challenges to their parole denials. The Court also rejects Petitioners' claim that formal notice-and-comment rulemaking is required, finding that the INS merely adjusted its general parole policy with regard to Haitians arriving in South Florida.

### A. Jurisdiction

Congress imposed several limitations on the scope of judicial review in the Illegal Immigration Reform and Responsibility Act of 1996 ("IIRIRA"). One such limitation provides:

Notwithstanding any other provision of law, no court shall have jurisdiction to review—(ii) any other decision or action of the Attorney General the authority for which is specified under this sub-

chapter to be in the discretion of the Attorney General, other than the granting of relief under section 1158(a) of this title.

INA § 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii). As the authority to grant parole is specified under INA § 212(b)(5)(A) to be within the discretion of the Attorney General, the Government contends that the Court has no jurisdiction over this matter.

The Supreme Court examined similar post-IIRIRA provisions of the INA in *INS v. St. Cyr*, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), and concluded that the statute precludes federal courts from engaging in full-scale "judicial review" of the Attorney General's decisions, but does not strip them of habeas jurisdiction under 28 U.S.C. § 2241 to review the legality of executive actions. 121 S.Ct. at 2285–86. The *St. Cyr* Court noted that in the immigration context, "judicial review" and "habeas corpus" have historically distinct meanings. *Id.* at 2285 (citing *Heikkila v. Barber*, 345 U.S. 229, 73 S.Ct. 603, 97 L.Ed. 972 (1953)). The crucial difference is the limited scope of habeas review. *Id.* Given the historic use of section 2241 habeas jurisdiction as a means of reviewing deportation and exclusion orders, the Supreme Court found Congress' failure to refer specifically to section 2241 to be particularly significant *Id.* at 2286 n. 36.

 Apparently, the Tenth Circuit is the only appellate court that has addressed the issue of whether INA § 242(a)(2)(B)(ii) strips federal courts of

habeas jurisdiction over challenges to INS parole determinations. *See Sierra v. INS*, 258 F.3d 1213 (10th Cir.2001). Applying the reasoning of *St. Cyr*, the *Sierra* court held that federal courts retain jurisdiction over habeas challenges to parole determinations.[8] *Id.* at 1217–18. The Court agrees with the Tenth Circuit for a number of reasons. First, the Supreme Court in *St. Cyr* concluded that the phrase "jurisdiction to review" as used in INA § 242(a)(2)(C), does not preclude habeas review. The Court sees no reason why the same phrase, as used in INA § 242(a)(2)(B)(ii) should have a broader meaning. Both provisions were enacted simultaneously in section 306 of IIRIRA, and Congress did not explicitly mention section 2241 habeas review in either subsection. Thus, neither provision "speaks with sufficient clarity to bar jurisdiction pursuant to the general habeas statute." *St. Cyr*, 121 S.Ct. at 2286. To the extent that Petitioners challenge the Attorney General's statutory and constitutional authority to refuse them parole allegedly without making case-by-case determinations, habeas jurisdiction exists to determine whether Petitioners are held in custody "in violation of the Constitution or the laws or treaties of the United States."[9] 28 U.S.C. § 2241(c)(3); *see Sierra*, 258 F.3d at 1217; *cf. Zavdydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 2497–98, 150 L.Ed.2d 653 (2001) (holding that section 2241 habeas proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention). The Court limits the scope of its review accordingly.[10]

---

**8.** *Sierra* involved the withdrawal of parole of a Mariel Cuban, which is covered by separate immigration regulations, yet the Tenth Circuit found no material difference between the situation in *Sierra* and a previous case involving a non-Mariel Cuban challenging the initial denial of parole, 258 F.3d at 1219 n. 4. Likewise, this Court finds no material difference between *Sierra* and the present case. The same

jurisdiction-stripping provision, INA § 242(a)(2)(B)(ii), is at issue here.

**9.** By contrast, the Court lacks jurisdiction over Petitioners' attempts to obtain full APA-style judicial review of the Attorney General's discretionary parole decisions. *See infra* section III.E.

**10.** In the instant Emergency Motion, Petitioners seek a temporary restraining order, pre-

## B. Constitutional Rights of Excludable Aliens

"For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government." *Mathews v. Diaz*, 426 U.S. 67, 81, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976). Courts " 'have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.' " *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210, 73 S.Ct. 625, 97 L.Ed. 956 (1953)). " 'Over no conceivable subject is the legislative power of Congress more complete.' " *Id.* (quoting *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339, 29 S.Ct. 671, 53 L.Ed. 1013 (1909)). Thus, "in the exercise of its broad power over immigration and naturalization, 'Congress regularly makes rules that would be unacceptable if applied to citizens.' " *Id.* (quoting *Mathews*, 426 U.S. at 79–80, 96 S.Ct. 1883).

▆▆▆ Particularly with regard to aliens seeking initial admission to this country, the role of federal courts is limited. The Supreme Court "has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." *Landon v. Plasencia*, 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982). Excludable aliens are "those who seek admission but who have not been granted entry into the United States. Even if physically present in this country, they are legally considered detained at the border". *Garcia–Mir v. Smith*, 766 F.2d 1478, 1483–84 (11th Cir. 1985). This is known as the "entry fiction." *Id.* Deportable aliens, by contrast, "have succeeded in either legally or illegally entering the country." *Id.* "Excludable aliens have fewer rights than do deportable aliens, and those seeking initial admission to this country have the fewest of all." *Id.* (citing *Landon*, 459 U.S. 21, 103 S.Ct. 321).

▆▆▆ Despite Petitioners' physical presence in this country, neither detention nor parole affects their legal status as excludable aliens. *See* INA § 212(d)(5)(A) ("[P]arole of such alien shall not be regarded as an admission of the alien...."). As excludable aliens, Petitioners "have no constitutional rights with regard to their [parole] applications." *Garcia–Mir*, 766 F.2d at 1484 (citing *Jean v. Nelson*, 727 F.2d 957, 968 (11th Cir.1984)). Rather, they possess only the statutory rights and privileges granted by Congress *See id.* Because the contours of such rights are "to be largely left to the discretion of the political branches," courts "should ordinarily abstain where excludable aliens are concerned."[11] *Id.* Thus, recognizing its nar-

---

liminary injunction, or, in the alternative, a class writ of habeas corpus. For the reasons set forth in this Order, the Court finds that it lacks independent jurisdiction over Petitioners' constitutional and APA claims apart from habeas jurisdiction under 28 U.S.C. § 2241. Habeas jurisdiction allows a court to equitably "dispose of the matter as law and justice require." 28 U.S.C. § 2243. Thus, a court granting a writ of habeas corpus may issue an injunction in aid of the writ. *See Pierre v. United States*, 525 F.2d 933, 936 (5th Cir. 1976) ("injunctive relief may be necessary to enforce the petitioners' right of liberty"); *United States v. Doherty*, 786 F.2d 491, 499 n. 11 (2d Cir.1986) (citing *Louis v. Nelson*, 544 F.Supp. 1004 (S.D.Fla.1982)); *Moore v. DeYoung*, 515 F.2d 437, 447 (3d Cir.1975). However, where a court has only habeas jurisdiction and determines that no writ shall issue, no separate basis exists for the issuance of injunctive relief.

**11.** *Garcia–Mir* was part of lengthy litigation following the Mariel Boatlift of 1980, in which 125,00 Cubans participated in a mass exodus from Cuba to the United States. 766

row role, the Court looks to the statutes and regulations promulgated by the political branches to determine whether Government officials have acted within the scope of their statutory and delegated authority.

### C. Statutory and Regulatory Framework

#### (1) Statutory Authority for Detention of Arriving Aliens

An alien who arrives without the proper documentation required by the INA is inadmissible pursuant to INA § 212(a)(7), and subject to expedited removal procedures under INA § 235. Under INA § 235, an immigration officer shall order the removal of an arriving alien unless the alien indicates an intention to apply for asylum or a fear of persecution, in which case the officer shall refer the alien for an interview by an asylum officer under INA § 208(b)(1)(B). *See* INA § 235(b)(1)(A), 8 U.S.C. § 125(b)(1)(A). If the asylum officer conducting the interview determines that the alien has a "credible fear" of

persecution, the statute provides that "the alien shall be detained for further consideration of the application for asylum." INA § 235(b)(1)(B)(ii), 8 U.S.C § 125(b)(1)(B)(ii). Thus, by statute, Congress has plainly indicated its intent and approval of the detention of an undocumented alien who has passed the credible fear interview, until adjudication of the asylum application.

#### (2) Parole of "Credible Fear" Aliens

Notwithstanding the broad statutory authority for detention of "credible fear" aliens, the Attorney General's regulations authorize the INS to consider parole for such aliens. The regulations provide that an alien who has passed the credible fear interview shall receive a Form I–862, Notice to Appear, for full consideration of the asylum and/or withholding of removal claim in regular removal proceedings under INA § 240.[12] 8 C.F.R. § 208.30(f). In addition, the regulations provide that "parole of the alien may be considered only in accordance with [INA] § 212(d)(5) and [8 C.F.R.] § 212.5." 8 C.F.R. § 208.30(f).

---

F.2d at 1480. In *Garcia–Mir*, the Eleventh Circuit emphasized the importance of judicial deference to the political branches' decisions with respect to such a crisis: "In overriding the government's decisions about how best to handle the sudden influx of Mariel Cubans, the district court has failed to take account of those significant countervailing national concerns that have led our immigration law to place primary decisionmaking authority about such a problem squarely into the hands of the political branches." *Id.* at 1484. In the instant action, the Government asserts that the Haitian adjustment policy was adopted, in part, to avoid a mass migration from Haiti. (Becraft Decl. ¶ 8.) Petitioners contend and submit statistics to show that, unlike the Mariel Boatlift, there is no current Haitian migration crisis. (Pets.' Reply at 7–10.) Petitioners' argument, however, disregards the importance of the separation of powers concerns that mandate judicial defer-

ence. The same "significant countervailing national concerns" that prevented the *Garcia–Mir* court from second-guessing the Attorney General's decisions in response to the Mariel Boatlift also guide this Court. Executive officials have considerable knowledge and experience with respect to both the history and the current situation in Haiti and South Florida. Thus, the Court must allow them to make policy determinations at the outset in an attempt to avoid what they perceive as a potential threat of another mass migration.

12. At this point, the alien moves out of "expedited removal proceedings" under INA § 235, and into regular removal proceedings under INA § 240. A "credible fear" alien's petition for asylum is then adjudicated before an immigration judge at a removal hearing. Currently, Petitioners are in regular section 240 proceedings, awaiting their removal hearings.

By statute, Congress has delegated to the Attorney General the authority to make parole determinations, as follows:

> The Attorney General may ... in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A).

██ Pursuant to this statutory authority, the Attorney General has promulgated 8 C.F.R. § 212.5 to govern parole determinations. By regulation, the Attorney General has delegated his parole authority, as follows:

> The authority of the Commissioner to continue an alien in custody or grant parole under [INA] § 212(d)(5)(A) shall be exercised by the district director or chief patrol agent, subject to the parole and detention authority of the Commissioner or her designees, which include the Deputy Commissioner, the Executive Associate Commissioner for Field Operations, and the regional director, any of whom in the exercise of discretion

may invoke this authority under [INA] § 212(d)(5)(A).

8 C.F.R. § 212.5(a).[13]

With respect to aliens who have passed the credible fear interview, the regulations establish the following standard for parole determinations:[14]

> "[T]he district director or chief patrol agent may, after review of the individual case, parole into the United States temporarily in accordance with [INA] § 212(d)(5)(A), any alien applicant for admission under such terms and conditions, including those set forth in paragraph (d) of this section, as he or she may deem appropriate."

8 C.F.R. § 212.5(c).

In furtherance of the regulations, in October, 1998, the INS issued a "Detention Use Policy" establishing the INS's priorities for the use of limited detention space. (Becraft Suppl. Decl. ¶ 5.) The Detention Use Policy defines four categories of aliens: (1) required detention (with limited exceptions); (2) high priority; (3) medium priority; and (4) low priority. With respect to "credible fear" aliens, the Detention Use Policy provides, "Although parole is discretionary in all cases where it is available, it is INS policy to favor release of aliens found to have a credible fear of persecution, provided that they do not pose a risk of flight or danger to the community." Such aliens fall within Category 4, or "low priority." The Government concedes that:

> In practice, the application of INS Detention Use Policy in the Miami District, because of limited detention space in

---

**13.** Acting Deputy Commissioner Peter Michael Becraft acted pursuant to this authority when he instructed Miami officials to adjust the parole criteria for Haitians arriving in South Florida. (Becraft Decl. ¶ 2; Becraft Suppl. Decl. ¶ 7.)

**14.** 8 C.F.R. § 212.5(b) governs parole for aliens in expedited removal proceedings. Once an alien moves into regular removal proceedings, *see supra* note 12, 8 C.F.R. § 212.5(c) applies.

that district, resulted in the parole of most arriving aliens found to have credible fear unless they were identified as posing a danger to the community because of a criminal record or other factors.

(Becraft Suppl. Decl. ¶ 6.)

*Haitian Policy Adjustment*

Becraft states that on or about December 14, 2001, he adjusted the criteria of the Detention Use Policy for arriving Haitian nationals, pursuant to his delegated authority under 8 C.F.R. § 212.5(a). (Becraft Suppl. Decl. ¶¶ 2, 7.) As a result of this adjustment, arriving Haitian nationals would no longer be considered "Category 4" or "low priority" aliens under the Detention Use Policy. (*Id.* ¶ 8.) Specifically, Becraft instructed the INS Office of Field Operations that "no Haitian should be paroled without the approval of INS Headquarters." (*Id.* ¶ 7.) His instructions were conveyed to the Miami District both orally and via electronic mail. (*Id.*) After the issuance of Becraft's instruction, the Miami District continued to review the files of arriving Haitians and advised INS Headquarters of cases of "unusual hardship," including pregnant women and unaccompanied minors. (*Id.*) INS Headquarters approved parole releases for the cases of unusual hardship. (*Id.*) Beginning on February 15, 2002, the Miami office was allowed to release juveniles with approved sponsors and pregnant females, without requesting approval from Headquarters. (2/15/02 e-mail of David J. Venturalla.) The Miami office also informed Headquarters of individuals who had been granted asylum by an immigration judge where INS counsel had decided not to appeal the grant of asylum, and Headquarters approved the release of the asylees on March 18, 2002. (Becraft Suppl. Decl. ¶ 7.)

## D. Lawfulness of the Haitian Policy Adjustment

### (1) *Jean v. Nelson*

According to Petitioners, the Supreme Court held in *Jean v. Nelson*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985), that the parole statute and regulations require the INS to make individualized parole determinations without regard to race or nationality. Upon closer examination, however, *Jean* establishes no such broad rule. The *Jean* majority expressly refused to address the constitutional issue and confined its ruling to the unique factual and procedural history of the case, as follows.

Until 1981, the INS followed a policy of general parole for undocumented aliens. *Id.* at 849, 105 S.Ct. 2992. In the late 1970's and early 1980's, large numbers of undocumented aliens arrived in South Florida, mostly from Haiti and Cuba. *Id.* Concerned about the large influx of undocumented aliens, the Attorney General ordered the INS to detain without parole any alien who could not present a prima facie case for admission. *Id.* The petitioners, Haitian detainees who had been denied parole, filed a class action lawsuit. The district court held that the new policy of detention without parole must be promulgated in accordance with APA rulemaking procedures and ordered parole of the detained class, with certain exceptions. *Louis v. Nelson*, 544 F.Supp. 973 (S.D.Fla. 1982). The INS promptly promulgated 8 C.F.R. § 212.5.

On appeal, the Eleventh Circuit affirmed the district court's ruling on the APA claim. *Jean v. Nelson*, 711 F.2d 1455, 1483 (11th Cir.1983) (hereinafter "*Jean I*"). In addition, the panel held that the Fifth Amendment's equal protection guarantee applied to the parole of unadmitted aliens, and found that the district court's finding of no invidious discrimination was clearly erroneous. *Id.* at 1483–1503. Sub-

sequently, the Eleventh Circuit granted rehearing en banc, thereby vacating the panel opinion. *Jean v. Nelson*, 727 F.2d 957 (11th Cir.1984) (hereinafter *"Jean II "*). By then, the remaining petitioners were being held under the new regulations; thus, the en banc court held that the APA claim was moot. *Id.* at 962. The en banc court also reversed the panel on the constitutional issue, holding that the Fifth Amendment's equal protection guarantee does not apply to the parole of undocumented aliens. *Id.* at 968–75. Notwithstanding its constitutional holding, the en banc court concluded that an INS official's decision to deny parole may be subject to limited judicial review for abuse of discretion, and remanded to the district court for a determination of whether low-level INS officials had exercised their discretion in an individualized and non-discriminatory manner. *Id.* at 975–79.

The Supreme Court held that the Eleventh Circuit should not have addressed the constitutional issue, since the petitioners only sought to have the statutes and regulations applied in a non-discriminatory manner.[15] *Jean*, 472 U.S. at 854–55, 105 S.Ct. 2992. In the Supreme Court, the government argued that it would be constitutionally permissible for the government to adopt different parole criteria for different nationalities, but also *conceded* that both the statute and the newly issued regulations, on their face, required INS officials in the field to make race- and nationality-neutral parole determinations. *Id.* at 855–56, 105 S.Ct. 2992. The Supreme Court adopted the petitioners' statement of the issue:

This case does not implicate the authority of Congress, the President, or the

Attorney General. Rather, it challenges the power of low-level politically unresponsive government officials to act in a manner which is contrary to federal statutes ... and the directions of the President and the Attorney General, both of whom provided for a policy of non-discriminatory enforcement.

*Id.* at 853, 105 S.Ct. 2992. With this narrow statement of the issue, the Supreme Court affirmed the Eleventh Circuit's remand for a determination of whether INS officials made parole determinations without regard to race or national origin, as the government conceded was required in that case. *Id.* at 857, 105 S.Ct. 2992. The Supreme Court held neither that excludable aliens have any constitutional rights with regard to their parole applications, nor that the Executive must maintain nationality-neutral parole criteria as a policy matter.

The crucial difference between *Jean* and the instant case is that, here, the Acting Deputy Commissioner of the INS has authorized a policy of denying parole to inadmissible Haitian nationals based on specific policy concerns, including the goals of preventing a mass migration from Haiti and ensuring the presence of Haitian asylum seekers at their removal hearings. Accordingly, the Court must determine whether Becraft, as Acting Deputy Commissioner, has the authority to promulgate such a policy.

#### (2) *Authority of Deputy Commissioner to Promulgate Policy*

By statute, Congress has delegated to the Attorney General the authority to make parole determinations. *See* INA

---

**15.** Although the Supreme Court held that the appellate court in *Jean II* should not have reached the constitutional issue, the en banc holding regarding the constitutional issue remains viable as the Supreme Court did not vacate the opinion but affirmed and remanded on alternative grounds. *See Cuban Am. Bar Ass'n, Inc. v. Christopher*, 43 F.3d 1412, 1428 n. 20 (11th Cir.1995) (internal cites omitted).

§ 212(d)(5)(A), 8 U.S.C. § 182(d)(5)(A). Congress has also authorized the Attorney General to establish regulations and "perform such other acts as he deems necessary for carrying out his authority under the provisions of [the INA] § 103(a)(3)", 8 U.S.C. § 103(a)(3). In addition, the statute provides that, "[the Attorney General] may require or authorize any employee of the [INS] or the Department of Justice to perform or exercise any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon any other employee of the [INS]." § 103(a)(4), 8 U.S.C. § 1104(a)(4).

Pursuant to statutory authority, the Attorney General has promulgated 8 C.F.R. § 212.5 to govern parole determinations. By regulation, the Attorney General has delegated the discretionary power to invoke the parole authority of INA § 212(d)(5)(A) to the INS Commissioner and certain designees, namely, the Deputy Commissioner, the Executive Associate Commissioner for Field Operations, and the regional director. 8 C.F.R. § 212.5(a). This provision was added to the regulations, effective January 29, 2001, in order to clarify that the parole authority vested in the Attorney General by INA § 212(d)(5) is delegated to the Commissioner, and that the parole power flows from the Commissioner to his designated subordinates without divesting the Commissioner or his subordinates of the delegated authority. *See* 65 Fed.Reg. 82254, 82254–55 (Dec. 28, 2000). Because the regulation explicitly delegates the Attorney General's parole authority to the Deputy Commissioner, the Court analyzes the Haitian adjustment policy established by Acting Deputy Commissioner Becraft in the same manner as if the Attorney General himself had promulgated the policy.

*"Facially Legitimate and Bona Fide Reason"*

Having determined that Acting Deputy Commissioner Becraft possesses sufficient authority to speak for the Executive branch, the Court reaches the heart of this dispute, namely, whether the Government is justified in adjusting its policy so as to result in the differential treatment of one national group. Here, the law makes clear that courts generally should defer to the Executive prerogative:

'[T]here is little question that the Executive has the power to draw distinctions among aliens based on nationality.' .... Aliens may be excluded on grounds that might be 'suspect in the context of domestic legislation,' because 'there are apparently no limitations on the power of the federal government to determine what classes of aliens will be permitted to enter the United States or what procedures will be used to determine their admissibility.'

*Cuban Am. Bar Ass'n,* 43 F.3d at 1427–28 (quoting *Jean II,* 727 F.2d at 978 n. 30, 965 n. 5).

■ to the political nature of decisions made by Congress and the he Executive in the immigration area, the standard of review applicable to immigration decisions is extremely deferential. A federal court's scope of review is limited to ascertaining whether the Government has advanced "a facially legitimate and bona fide reason" for its decision. *Garcia–Mir,* 766 F.2d at 1484–85 (citing *Jean II,* 727 F.2d at 977); *see also Cuban Am. Bar Ass'n,* 43 F.3d at 1427–28. Because the political branches share concurrent authority over immigration matters, the same narrow standard of review applies to actions taken by Congress or the Executive. *Jean II,* 727 F.2d at 976. With respect to parole determinations, the same standard applies to general policy decisions of high-level Executive officials and to individual determinations

made by INS field officers. *See Garcia–Mir*, 766 F.2d at 1485.

### (a) *The Policy Adjustment*

Acting Deputy Commissioner Becraft advances a number of justifications for the adjusted policy with respect to undocumented Haitians. First, he notes a sharp increase in maritime departures from Haiti beginning in November, 2001, when the Coast Guard reported interdicting vessels carrying a total of 350 Haitian nationals, in contrast to a total of 96 interdictions in the preceding three months. (Becraft Decl. ¶ 6.) After the Coast Guard rescued 187 Haitian nationals from the *Simapvivetzi* in early December, and the reported drowning of two others, Becraft explains:

> In the wake of this sharp increase in dangerous maritime departures from Haiti, consultations occurred among officials from several executive agencies and INS officials, including myself. In these consultations, the following concerns were discussed: (1) the possibility that the numbers of Haitians embarking in U.S.-bound boats would continue to increase and turn into a mass migration; (2) that the U.S. should take steps to discourage Haitians from contemplating dangerous voyages to the United States; (3) that paroling the migrants from the December 3 vessel might cause others to attempt dangerous maritime departures, placing themselves at risk, or trigger a mass migration from Haiti to the United States; (4) that adjusting the INS' parole criteria with respect to Haitians arriving by boat in South Florida, so that the parole criteria would be applied in a more restrictive manner, would be a reasonable step to take to address concerns (1) to (3) above; and (5) that the Haitians from the December 3 vessel, and other Haitians who might arrive in a similar fashion in South Florida, are less

likely to appear for their immigration proceedings or for removal, if they ultimately received final orders of removal, given their demonstrated desperation to depart Haiti.

(Becraft Decl. ¶ 8.) Based on these considerations, Becraft states that he exercised his authority under INA § 212(d)(5) and 8 C.F.R. § 212.5(a), and instructed the Office of Field Operations to adjust its parole criteria with regard to inadmissible Haitians arriving in South Florida so that no Haitian would be released without INS Headquarters approval. (*Id.*) After Becraft's instructions were communicated to the Miami office, local officials continued to review the parole applications of arriving Haitians and released individuals with unusual hardships, such as pregnant women and unaccompanied minors. (Lee Decl. ¶ 2.)

When analyzing an Executive official's exercise of discretion, a court must avoid overriding the policy determination of the Attorney General's designee. *See Garcia–Mir*, 766 F.2d at 1485. The Court need not agree with the policymaker's choice nor approve of the policy reasons underlying it; rather, the Court must only ascertain whether the Government has advanced a facially legitimate and bona fide reason supporting the decision. *See id.* (citing *Jean II*, 727 F.2d at 977). Here, the Court finds that preventing loss of life and avoiding a mass migration from Haiti are facially legitimate and bona fide reasons for detaining Haitian nationals who arrive by boat in South Florida. This conclusion is supported by the declaration of U.S. Coast Guard Lieutenant Bryan E. Clampitt, indicating that at least eighteen Haitian migrants died attempting to reach the shores of South Florida in the past year, in addition to the two who reportedly drowned attempting to swim ashore from the *Simapvivetzi*.[16] (Clampitt Decl. ¶¶ 4–

---

**16.** In addition, the Coast Guard recently res- cued 73 Haitian survivors from a 35–foot sail-

5.) Lieutenant Clampitt also states that the Coast Guard interdicted approximately thirty vessels containing Haitian migrants between March 15, 2001 and March 15, 2002, and that almost all such vessels must be destroyed by the Coast Guard after interdiction, due to their unseaworthy condition. (*Id.* ¶ 3.) In light of such credible evidence from Executive officials of recurring loss of life and the potential for future danger and large-scale loss of life, the Court may not further scrutinize the policy choices made by the properly delegated Executive officials.

In addition, parole determinations normally take account of the possibility that an excludable alien may abscond to avoid being returned to his or her home country. *See, e.g. Garcia–Mir,* 766 F.2d at 1485; *Bertrand,* 684 F.2d at 214–18. Here, Acting Deputy Commissioner Becraft concluded that Haitians arriving by boat would be less likely to appear for immigration proceedings, given their demonstrated desperation to leave Haiti. (Becraft Decl. ¶ 8.) The Court finds that this is a facially legitimate and bona fide reason to deny parole, and, therefore, the Court will not speculate as to whether the same goal could be achieved through alternative means.

#### (b) *Individualized Determinations*

Having determined that the Haitian adjustment policy is supported by a facially legitimate and bona fide reason, the only remaining question is whether low-level Miami officials implemented the policy as intended by the policymakers. The Officer in Charge of INS Krome Service Processing Center indicates that after receiving Becraft's instructions on December 14, 2001, the deportation officers in Miami continued to review Haitians' parole re-

quests on an individual, case-by-case basis. (Lee Decl. ¶ 12.) Lee himself recommended to Headquarters the release of approximately fifteen Haitians with cases of unusual hardship, and Headquarters approved of parole in those cases. (*Id.*)

■ Petitioners do not allege that they are entitled to release under the adjusted policy. In addition, none of the named Petitioners' parole applications indicates any unusual hardship that would qualify for consideration by Headquarters. Based on the record, the Court finds that Miami officials have implemented the policy as established by high-level INS officials. Because the policy is supported by a facially legitimate and bona fide reason, the Court concludes that the named Petitioners were properly denied parole.

### E. APA Challenges

■ The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review." 5 U.S.C. § 702. However, judicial review is not available under the APA where otherwise precluded by statute. 5 U.S.C. § 701(a)(1). In the instant case, the INA precludes judicial review of any decision or action of the Attorney General "the authority for which is specified under [title II of the INA] to be in the discretion of the Attorney General." INA § 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii). Thus, the APA does not provide a basis for Petitioners to challenge the Attorney General's exercise of discretion in denying their parole requests *See, e.g., St. Cyr,* 121 S.Ct. at 2285–86.

■ Petitioners also argue that the INS's policy toward Haitians is subject to

---

boat that capsized near the Bahamas. When the Coast Guard suspended its search for survivors on May 11, 2002, thirteen Haitians were reported dead, and another fourteen re-

mained missing. *See* Anabelle de Gale, *One Body Recovered, but Search Suspended for Haitians at Sea,* Miami Herald, May 12, 2002.

the APA's "notice and comment" rulemaking requirements, 5 U.S.C. § 533 *et seq.* Here, Petitioners claim that the Government's adjustment of policy violated the APA's statutory requirements, not that it constituted an abuse of discretion. Thus, INA § 242(a)(2)(B)(ii) does not preclude jurisdiction. The Court may address this claim under habeas jurisdiction because if the APA required notice-and-comment rulemaking for the policy pursuant to which Petitioners were held, their detention could be "in violation of ... the laws ... of the United States." 28 U.S.C. § 2241(c)(3). The Government contends that the current policy toward Haitians is "merely an adjustment to the INS's Detention Use Guidelines, limited to one district." (Resp. at 3.) The Government maintains that its actions toward Haitians are exempt from the APA's rulemaking requirements under the "general policy statement" and "foreign affairs" exceptions.

The APA defines a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4). As the definition of "rule" is quite broad, the APA provides a number of exceptions that permit promulgation of certain rules without recourse to the rulemaking procedures. One exception is for "general statements of policy," a term not defined by statute. 5 U.S.C. § 553(b)(3)(A). "A critical test of whether a rule is a general statement of policy is its practical effect in a subsequent administrative proceeding: A general statement of policy ... does not establish a 'binding

norm.' It is not finally determinative of the issues or rights to which it is addressed." *Guardian Fed. Sav. & Loan Assoc. v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 666 (D.C.Cir.1978), *cited with approval in Ryder Truck Lines, Inc. v. United States*, 716 F.2d 1369, 1377 (11th Cir.1983); *Jean I*, 711 F.2d at 1480–83 (vacated as moot).

■ Here, the policy adjustment does not establish a binding norm because it does not finally dispose of an individual Haitian's parole application. The Detention Use Policy, which was not promulgated as a rule, specifically states, "Although parole is discretionary in all cases where it is available, it is INS policy to favor release of aliens found to have a credible fear of persecution." The adjusted policy does not negate the discretionary nature of the parole determination, and it does not prevent INS officials from granting parole. Instead, the adjustment only requires that Miami officials obtain Headquarters' approval before granting parole to a Haitian who did not arrive by regular means at a designated port of entry. The policy allows Miami officials to release pregnant women and juveniles with approved sponsors on parole without obtaining Headquarters approval, and it allows them to forward any other case of unusual hardship to Headquarters for approval. Even under the adjusted policy, each case receives individual consideration. Therefore, the adjustment does not establish a "binding norm," and it need not be promulgated as a rule under the APA.[17]

## IV. Conclusion

When Petitioners boarded the *Simapvivetzi*, they risked their lives in search of freedom and democracy in the United States. Paramount within our democratic

---

**17.** Because the Court finds that the Haitian policy qualifies for the "general statement of policy" exception to the APA rulemaking requirements, the Court need not decide whether the politically sensitive "foreign affairs" exception applies.

values is the separation of powers among the three co-equal branches of government. The law teaches us that the power to control a nation's borders is so fundamental to its sovereignty that we must abide by the lawfully enacted policy decisions made by the Legislative and Executive branches, or seek change at the ballot box. In immigration matters, neither individuals nor the Court can substitute their policy perspectives for the judgments made by Executive officials, based upon facially legitimate and bona fide reasons, pursuant to statutory and delegated authority.

As the Court has determined that a writ of habeas corpus shall not issue, no basis exists for the issuance of a preliminary injunction or temporary restraining order, or any further action in this matter. Accordingly, it is

**ORDERED AND ADJUDGED** that:

1. Petitioners' Emergency Motion for Temporary Restraining Order and/or Preliminary Injunction or Class Writ of Habeas Corpus, and for an Immediate Hearing (D.E.2), filed March 15, 2002, is **DENIED.**

2. The Class Action Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief (D.E.1), filed March 15, 2001, is **DISMISSED.**

3. This case is **CLOSED.**

4. All motions not otherwise ruled upon by separate order are **DENIED AS MOOT.**